In the

# United States Court of Appeals

### For the Seventh Circuit

_____

Nos. 20-2069 & 20-2155

KR ENTERPRISES, INC.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

ZERTECK INC., doing business as BOAT-N-RV
WAREHOUSE, et al.,

*Defendants-Appellants,*
*Cross-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:16-cv-00708-PPS — **Philip P. Simon**, *Judge.*

_____

ARGUED DECEMBER 8, 2020 — DECIDED JUNE 3, 2021

_____

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit
Judges.*

HAMILTON, *Circuit Judge.* In 2016, a manufacturer of recreational vehicles delivered 21 new RVs to a group of affiliated dealers. Those dealers did not pay before the manufacturer went out of business. The dealers kept the RVs but have

refused to pay the manufacturer's secured creditor, which brought this suit to collect the accounts receivable. After the secured creditor assigned its rights to the owner of the manufacturer, the district court held a bench trial and found that the secured creditor's assignee was entitled to payment of the purchase prices, minus some setoffs for warranty and rebate claims that the manufacturer had owed to the dealers on earlier RV sales. See *KR Enterprises, Inc. v. Zerteck, Inc.*, 461 F. Supp. 3d 825 (N.D. Ind. 2020).

The defendant dealers have appealed, arguing they owe nothing for the RVs they received, at least not to this plaintiff. The secured creditor's assignee has cross-appealed, arguing that the setoffs should not have been allowed and that it is entitled to prejudgment interest. We affirm in all respects.

I.   *Factual and Procedural History*

Evergreen Recreational Vehicles, LLC, manufactured RVs and sold the 21 RVs at issue here in the spring of 2016. Evergreen went out of business in June 2016, a couple of months after delivering those 21 RVs to several legally distinct but affiliated dealers, which all do business under "Boat-N-RV" names.[1] Each dealer regularly purchased RVs from Evergreen. The invoices for the 21 RVs totaled $808,663. The

---

[1] The defendant-dealers are Zerteck, Inc., d/b/a Boat-N-RV Warehouse (NY); Tilden Recreational Vehicles, Inc., d/b/a Boat-N-RV Superstore (PA); Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV Megastore (SC); Ridgeland Recreational Vehicles, Inc., d/b/a Boat-N-RV World (NC); Crossville BNRV Sales, LLC, d/b/a Boat-N-RV Supercenter (TN). Florida BNRV Sales, LLC, d/b/a Factory Direct Marine & RV (FL) was the sixth dealer involved in the original litigation but is now defunct and not party to this appeal.

dealers resold at least 20 of them to retail customers but have yet to pay Evergreen or its secured creditor for any of them.

This lawsuit was filed originally in state court by 1st Source Bank, which was the principal lender to Evergreen and had a first-priority blanket security interest in all Evergreen assets, including accounts receivable like the amounts the dealers owed for these 21 RVs. The defendant dealers removed the case to federal court. While the case was pending, 1st Source assigned its rights to KR Enterprises, which had been the principal owner of Evergreen, after KR paid off Evergreen's debt to 1st Source. After the assignment, KR Enterprises was substituted as plaintiff, asserting claims through 1st Source's security interest in the collateral of Evergreen.

Following a bench trial, the district court found that KR Enterprises had standing as a secured party and had proven that the dealers had breached the contracts by failing to pay. The court ruled in favor of the dealers on several other theories of liability. On the breach-of-contract claims, the court allowed the dealers certain setoffs for warranty and rebate claims and denied prejudgment interest on the net amounts the dealers owed. The dealers have appealed, denying all liability. KR Enterprises has cross-appealed on the setoffs and the denial of prejudgment interest.

The district court properly exercised jurisdiction under 28 U.S.C. § 1332(a). Complete diversity of citizenship existed between the parties, and the amount-in-controversy requirement was satisfied in at least two ways. First, plaintiff KR Enterprises offered colorable grounds for holding all the separate defendants jointly and severally liable for the full amount in controversy, even though the district court declined to impose joint and several liability. Second, even when the

amounts sought by plaintiff were separated for each of the defendants, the gross invoices to each individual defendant exceeded $75,000 before any discounts for the disputed setoffs for rebate and warranty claims. The parties agree that Indiana law applies, and we exercise appellate jurisdiction under 28 U.S.C. § 1291.

We consider in Part II the defendant dealers' argument that KR Enterprises does not have proper standing as a secured party. Part III addresses both sides' challenges to the district court's treatment of the dealers' claims for warranty repairs and rebates owed on earlier RV sales, as well as the denial of prejudgment interest.

## II.  *Plaintiff's Standing as a Secured Party*

In 2009, Evergreen and its lender 1st Source Bank signed an agreement for a secured loan. In exchange for the loan and line of credit, Evergreen granted 1st Source a first-priority blanket security interest in all assets, including accounts receivable. Under the terms, nonpayment resulted in default, and if default continued, 1st Source could "exercise all rights and remedies provided in this Agreement…."

As noted, Evergreen closed its operations in June 2016. It stopped paying 1st Source and went into default. As of November 2016, Evergreen owed 1st Source more than $1 million, leading 1st Source to file this lawsuit to collect the amounts owed by the defendant dealers for the 21 disputed RVs.

In 2018, while this suit was pending, 1st Source assigned its rights as a secured lender to plaintiff KR Enterprises in return for a payment by KR Enterprises that satisfied Evergreen's debt to 1st Source. (KR Enterprises had been the

principal owner of Evergreen and its owner, Kelly Rose, had personally guaranteed Evergreen's debt to 1st Source.) Defendants argue that 1st Source and KR Enterprises timed and documented the transaction so clumsily as to wipe out both parties' security interest in the Evergreen accounts receivable. The district court rejected that audacious theory, and so do we.

Defendants seize on the fact that KR Enterprises made its big payment to 1st Source on the Evergreen account on March 2, 2018, while 1st Source did not execute its General Assignment of its rights as a secured lender until two months later, on May 1, 2018. As defendants see things, after the March 2, 2018 payment, 1st Source recorded the debt owed by Evergreen as zero, effectively wiping out both the debt and the accompanying security interest that allowed it to sue. By May 1, 2018, goes the theory, when 1st Source signed the General Assignment to KR Enterprises, 1st Source no longer had any security interest to assign, making the assignment ineffective.[2]

---

[2] The parties have briefed this question in terms of standing. We think the better approach would be in terms of whether KR Enterprises is the real party in interest, but because KR Enterprises prevails either way, we need not dwell on this point. See generally *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) ("The requirements of Rule 17 should not be confused with the jurisdictional doctrine of standing."); *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996) (plaintiff's problem "is not standing (in the sense that the complaint does not allege a 'case or controversy' justiciable under Article III) but the identity of the real party in interest"); 6A Wright & Miller, Federal Practice & Procedure § 1542 (3d ed.) (distinguishing among capacity to sue, real party in interest, and standing: "a person may have capacity to sue under Rule 17(b),

Testimony from 1st Source vice president Richard Rozenboom and KR's Kelly Rose made unmistakably clear that KR Enterprises and 1st Source understood and intended that 1st Source gave the General Assignment in exchange for KR Enterprises' payment of Evergreen's debt to 1st Source. Those parties did not close that exchange at one time at one conference table, but the intent to exchange was clear and perfectly valid.

"Under Indiana law, a determination of whether or not an assignment has been made focuses on the intent of the parties. Any actions or words which show an intention of transferring the [chosen] action to an assignee for valuable consideration are sufficient." *Crowel v. Admin. of Veterans' Affairs*, 699 F.2d 347, 352 (7th Cir. 1983) (cleaned up); see also 2A Anderson, U.C.C. § 2-210:24 (3d ed. 2020) ("The intent of the parties to make an assignment is a question of fact to be derived not only from the instrument executed by the parties, but also from the surrounding circumstances.").

In response to the testimony from Rozenboom and Rose explaining that this was all one transaction that took a while to close, the dealers invoke the parol evidence rule, part of every first-year law student's education. Under that rule, the dealers argue, such oral testimony and other documents cannot be used to vary the unambiguous terms of the General Assignment. See, e.g., *Amici Resources, LLC v. Alan D. Nelson Living Trust*, 49 N.E.3d 1046, 1050 (Ind. App. 2016) (under parol evidence rule, "extrinsic evidence is inadmissible to add to, vary, or explain the terms of a written instrument if the

---

but if the person has assigned all interest in the claim before the action is instituted, the person no longer is the real party in interest …").

terms of the instrument are clear and unambiguous") (citations omitted).

The correct response to the dealers' argument is that even where the parol evidence rule might apply to a dispute between the parties to the unambiguous written contract, strangers to that contract are not entitled to invoke the rule. In *Amici Resources*, for example, the court explained: "the inadmissibility of parole evidence to vary the terms of a written instrument does not apply to a controversy between a third party and one of the parties to the instrument." *Id.* (citations omitted).

The stranger-to-the-contract exception is well-established in Indiana law. It seems to be litigated most often in disputes over litigation releases but applies to other sorts of contracts as well. See, e.g., *State Highway Comm'n v. Wilhite*, 31 N.E.2d 281, 282 (Ind. 1941) (holding that "the general rule that resort may not be had to parol evidence … does not apply to others than the parties to the instrument," and permitting extrinsic evidence where injured employee sued a third-party employer not a party to the original release); *White v. Woods*, 109 N.E. 761, 763 (Ind. 1915) ("The relations between two persons who have contracted in writing may be brought in issue collaterally in a suit between others. In such a case the parol evidence rule does not apply. The facts may be proved as they exist, regardless of the oral evidence varying the terms of any writing between the parties.") (quotations omitted); *Burns v. Thompson*, 91 Ind. 146, 150 (Ind. 1883) ("[A]side from the question of fraud, while a dispositive instrument can not be varied by parol, so far as the parties to it are concerned, yet, in respect to strangers, written instruments, usually have no binding force, and the familiar rule against the variation of such

instruments by parol evidence applies only to parties and privies, and does not forbid their being attacked and contradicted by parol by strangers to them.") (citations omitted); *Depew v. Burkle*, 786 N.E.2d 1144, 1148–49 (Ind. App. 2003) (considering parol evidence about a release of original tortfeasor to determine whether patient also intended to release third-party doctor); *Cooper v. Cooper*, 730 N.E.2d 212, 216 (Ind. App. 2000) (applying stranger-to-the-contract exception to dispute over land sale and concluding that "the inadmissibility of parol evidence to vary the terms of a written instrument does not apply to a controversy between a third party and one of the parties to the instrument") (citations omitted).

The dealers respond to the stranger-to-the-contract cases by saying they do not apply if the written contract is unambiguous, citing *Evan v. Poe & Assoc., Inc.*, 873 N.E.2d 92, 103–05 (Ind. App. 2007). This suggested limit would effectively nullify the stranger-to-the-contract exception, of course, since the general rule against parol evidence applies only when the contract is unambiguous. We rejected the dealers' suggested limit in *Deckard v. General Motors Corp.*, 307 F.3d 556 (7th Cir. 2002):

> Indiana already recognizes that parol evidence can be considered if the contract is ambiguous. See, e.g., *Huffman* [*v. Monroe County Community Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992)] (holding that where "contradictory references cloud the intent of the document … parol evidence may be utilized to determine the parties' true intentions respecting the document's application"). The "stranger to the contract" exception is an additional exception to the parol

> evidence rule. For example, in *Wilhite*, despite the plain and unambiguous language of the contract, the court held that parol evidence could be used to determine the intent of the parties. *Wilhite*, 31 N.E.2d at 282. While commentators have criticized the "stranger to the contract" exception to the parol evidence rule, see 13 A.L.R.3d 313, § 2c (arguing that the parol evidence rule should apply both to strangers and to parties), *Wilhite*, *White* and *Burns* have not been overruled in Indiana.

307 F.3d at 565.

To avoid the stranger-to-the-contract exception, the dealers here cite a case we decided in 1993, some years before *Deckard*. In *McWaters v. Parker*, 995 F.2d 1366 (7th Cir. 1993), the parties disputed the scope of a settlement that released one of several joint tortfeasors. We applied Indiana law and affirmed summary judgment enforcing the unambiguous language of the release. *Id.* at 1370, 1375–76. We declined to look beyond the four corners of the release agreement, finding that "the language of the form clearly demonstrates the existence of adequate consideration and a meeting of the minds." *Id.* at 1375. In *McWaters*, however, we did not address the "stranger-to-the-contract" line of cases, nor did the parties' briefs even cite those cases. *Deckard* thus represents our latest application of the "stranger-to-the-contract" exception, in which we expressly rejected the attempt to limit the exception to ambiguous written contracts, for that would be no exception at all.

Complicating matters, however, one decision by the Indiana Court of Appeals noted that it was "not bound by the Seventh Circuit's interpretation of Indiana law" in *Deckard* and

instead found *McWaters* "persuasive." *Evan*, 873 N.E.2d at 103–04. In *Evan*, homeowners had a dispute with their insurance company. They resolved that dispute by signing a settlement agreement that released the homeowners' claims against the insurance company and its "agents." The homeowners then sued the insurance agency through which they had purchased the policy, asserting that the agency had been negligent in omitting key information about their prior claims against other insurers, leading to the dispute with the insurer. The Indiana Court of Appeals affirmed summary judgment for the agency based on the release, despite testimony from the homeowners and their attorney that they had not intended to release the negligent agency. The court held: "in the context of a controversy that exists between a third party and one of the parties to the instrument, when a release is unambiguous we need not look at any other evidence to determine the parties' intent." 873 N.E.2d at 104.

*Evan* and *McWaters* do not persuade us to depart from our express holding in *Deckard*. *McWaters* did not address the "stranger-to-the-contract" issue at all, and we find it difficult to reconcile *Evan*'s treatment of this issue with the Indiana Supreme Court cases and other precedents that we relied upon in *Deckard*. In applying state law, our task is to predict how we think the state supreme court would rule on the issue if it were presented now. We ordinarily give great weight to decisions of intermediate appellate courts, but where one decision by an intermediate court seems to stray from the established course of the state's law, especially as written by the state supreme court, we need not follow it. See *Luna v. United States*, 454 F.3d 631, 636 (7th Cir. 2006) (district court erred by following recent decision of intermediate state court that departed from state supreme court precedent); see generally

*Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 782–83 (7th Cir. 2011) ("In deciding questions of state law, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently.") (citation omitted); *Allstate Ins. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) (in absence of prevailing authority from highest state court, federal court can give "great weight to the holdings of the state's intermediate appellate courts" but can deviate "when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court"). Moreover, releases of joint tortfeasors pose some special problems for the state courts that handle by far the greater volume of tort cases. So we do not decide here that *Evan* states Indiana law incorrectly for such cases. It is enough to say that its treatment of the release problem should not be extended to a case like this one, involving an assignment of a security interest in exchange for payment of the underlying debt. Applying the *Evan* approach to this case would effectively nullify Indiana's established "stranger-to-the-contract" exception to the parol evidence rule.

The district court did not err by admitting and then crediting the relevant testimony from Rozenboom and Rose and recognizing that KR Enterprises paid off the Evergreen loan in return for assignment of 1st Source's security interest. The district court thus correctly found that the parties did not intend to erase the security interest at the heart of the transaction and that the General Assignment transferred a priority security interest in the RVs from 1st Source to KR Enterprises, making KR Enterprises the proper plaintiff here.

III. *"Material" Breaches and Setoffs*

To avoid paying for the 21 RVs they received, the defendant dealers also argue that Evergreen was the first to breach the relevant contracts. The dealers rely primarily on Evergreen's failure to pay the dealers promised rebates and warranty obligations on earlier RV sales. The dealers argue further that Evergreen breached its contracts with them by delivering defective RVs and by shutting down its business, leaving the manufacturer's warranty worthless. The dealers contend that all of these actions relieve them of any obligation to pay the purchase prices for the 21 new RVs. The district court rejected these arguments. It concluded that the solution was to hold the dealers liable for the purchase prices of the RVs but to allow them setoffs for the rebates and warranty payments that Evergreen owed them, effectively netting out the parties' respective obligations. That was the right solution.

A. *Voiding the Manufacturer's Warranty*

In this set of issues, we first address the dealers' arguments that they are not required to pay for the RVs because they were defective when they were delivered. The dealers say the defective deliveries were the first material breaches and that those breaches excuse them from paying for the RVs at all. We need not address some obvious legal questions posed by this theory, such as what types of defects in a complex product allow a buyer to rescind the sale rather than have the manufacturer repair the product under a warranty. See, e.g., *Mathews v. REV Recreation Group, Inc.*, 931 F.3d 619, 622–24 (7th Cir. 2019) (finding no breach of express warranty because defendant was not given reasonable opportunities to fix several defects); *Anderson v. Gulf Stream Coach*, 662 F.3d at 782–83 (concluding that plaintiffs had given defendant

reasonable opportunity to cure multiple defects and reversing district court's rejection of plaintiffs' claims for breach of express warranty); *Reger v. Arizona RV Centers, LLC*, No. 3:16-CV-778-MGG, 2021 WL 274316 (N.D. Ind. Jan. 26, 2021) (discussing whether rust, frame-rail extension issues, and other defects were covered by warranty); *Pegg v. Nexus RVs LLC*, No. 3:16-CV-783-PPS, 2019 WL 2772444 (N.D. Ind. July 2, 2019) (addressing which defects were under warranty). Nor do we need to decide what the buyer's remedy should be if the buyer has already resold the allegedly defective product. We can reject this defense on simpler factual grounds. The district court made no finding that these 21 RVs were defective; the dealers simply failed to support that factual claim. We find no clear error in that respect, so we need not sort out the ways in which the dealers seek remedies that would not fit such alleged breaches.[3]

The dealers also argue that Evergreen breached the sales contracts for these 21 RVs by shutting down its business so that it would no longer honor the manufacturer's warranty. Again, the dealers' theory is that those were "first breaches," relieving the dealers of their obligation to pay the purchase prices. And again, the remedy they seek does not fit the alleged breaches. But the more basic factual problem is that Evergreen's failure to honor its manufacturer's warranty *after its June closure* could not have been a "first" breach on RVs

---

[3] An Evergreen executive testified vaguely that "the amount of product that Evergreen had put out the door wasn't—was just—wasn't all that great." Another testified that warranty costs were a "factor" in Evergreen's 2016 financial losses. This evidence fell well short of showing that these 21 RVs were "defective" as the dealers contend.

delivered in April and May. The dealers breached first by failing to pay.

B.  *Warranty and Rebate Obligations*

As a part of each RV sale, Evergreen promised rebates to dealers and offered a manufacturer's warranty in which it agreed to pay the dealers to make covered repairs. In the first quarter of 2016, however, Evergreen failed to pay the defendant dealers rebates and warranty repairs for 45 RVs it had previously sold to them. The total amount that Evergreen owed these dealers was $160,059. Despite these arrearages, in the spring of 2016, the dealers ordered the 21 additional new RVs from Evergreen, with invoices totaling $808,663. In June 2016, the dealers terminated their dealership agreements with Evergreen and instructed their lender not to make any more payments to Evergreen for the RVs that had been delivered.

Both sides overreach in their arguments about the effect of these debts that Evergreen owed on other RVs. The dealers contend that Evergreen's failure to make timely payments entitles them to keep (and resell) the 21 new RVs without paying for them. KR Enterprises contends that it has no obligation to give the dealers any credit for the amounts Evergreen owed them. The district court rejected both positions, finding that the rebate and warranty arrearages did not relieve the dealers of their obligations to pay for the 21 new RVs but that they were entitled to setoffs.

The dealers base their position on the theory that the entire account between Evergreen and each dealer was the relevant contract, so that an earlier failure to pay a rebate or a warranty obligation amounted to a first "material" breach of the entire contract. The parties' briefs debate whether the relevant

contract for "first breach" purposes is the entire account or whether each RV was the subject of a separate contract under an umbrella of a course of dealing. With respect, we do not agree that this rather metaphysical question is decisive. Whether each dealer's account with Evergreen constituted a contract or, as the district court found, only a course of dealing, the proper remedy for Evergreen's breach of warranty and rebate payments was not for the dealers to order and then refuse to pay for 21 new RVs. It was to allow the dealers setoffs on the amounts they owed for those 21 new RVs.

While we affirm the district court's judgment in its entirety, there are two points on which we disagree with its legal analysis. The first was the district court's finding that Evergreen's failures to pay rebates and warranty obligations were not "material" breaches of the contracts for the sales of the earlier RVs. We disagree. A manufacturer's promises to pay its dealers rebates and the costs of warranty repairs easily qualify as material terms of the sales contracts, and such breaches call for remedies. The district court's ultimate handling of those debts, however, was exactly right, by allowing the dealers to set those debts off against the amounts they owed Evergreen (and now KR Enterprises).

"Material" is a slippery term in the law in general and in contract law more specifically. It is best to get beyond labels and focus on consequences and remedies, as we try to do here. To explain, courts say in broad terms that a material breach is one that goes to the "heart" of the contract. *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 158–59 (Ind. 2016). To determine whether a "failure to perform a contractual duty amounts to a material breach, Indiana has adopted the view of the Restatement (Second) of Contracts, which considers

several factors [, including…] the extent to which the injured party will be deprived of the benefit which he reasonably expected….” *Dick v. Conseco, Inc.*, 458 F.3d 573, 578 (7th Cir. 2006); *Int'l Bus. Machines Corp.*, 51 N.E.3d at 160 (instructing courts to revert to common-law Restatement factors where a contract is silent as to materiality); Restatement (Second) of Contracts § 241 (1981) (listing significant circumstances to determine whether a failure is material).[4]

Price is of course a material term of a sales contract, and a promised rebate directly affects the price. See, e.g., *Adams Apple Dist. Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925, 929 (7th Cir. 1985) (applying Illinois law; failure to pay rebates constituted material breach of contract for sale of cigarette rolling papers). Warranties of goods are also material terms, as any new-car buyer can appreciate, and that holds true in sales by manufacturers to dealers, too. See U.C.C. § 2-313 (“Express warranties by the seller are … [a]ny … promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain*….”) (emphasis added).

So we assume that Evergreen's failures to make timely payments for rebates and warranty repairs were “material”

---

[4] The factors are: “(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform…will suffer forfeiture; (d) the likelihood that the party failing to perform … will cure his failure …; (e) the extent to which the behavior of the party failing to perform … comports with standards of good faith and fair dealing.” *Conseco, Inc.*, 458 F.3d at 578, citing *Frazier v. Mellowitz*, 804 N.E.2d 796, 803–04 (Ind. App. 2004), quoting Restatement (Second) of Contracts § 241 (1981).

breaches for earlier sales of RVs and would warrant a remedy for the breaches. Saying that they were material breaches, though, does not really decide this case. The issue here is not materiality in the abstract but the *appropriate remedy*. The dealers contend that Evergreen's breaches of the warranty and rebate terms of earlier sales entitled them to keep the new RVs without paying for them. This extraordinary assertion is a misguided variant of what the Restatement (Second) and Williston describe as a "total" breach of a contract. See 23 Williston on Contracts § 63:3 (4th ed.) ("A 'total breach' is a breach that so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow that party to recover damages based on all of its remaining rights to performance."), citing *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 608 (2000), citing in turn Restatement (Second) of Contracts § 243.

A manufacturer's breach of one warranty or rebate claim would ordinarily seem easy to remedy with a repair or a payment of the amount due, without broader legal consequences for the parties' relationship. But a manufacturer's repeated breaches of warranty or rebate claims could so undermine a dealer's confidence in the manufacturer's products, promises, or credit that they would "substantially impair the value of the contract" to the dealer. We can assume here for purposes of argument that the combined effects of Evergreen's earlier warranty and rebate breaches would have met that standard and given the dealers sufficient cause to terminate any dealership contracts with Evergreen and to refuse delivery or cancel orders they had placed earlier. See, e.g., *United States v. Under Seal*, 902 F.3d 412, 418 (4th Cir. 2018) (where one party commits a material breach, the non-breaching party may elect

to terminate the entire agreement), citing 23 Williston on Contracts § 63:8 (using language of "total" breach). Corbin makes the same point using the language of "material" breach. 10 Corbin on Contracts § 53.4, n.1 (2021) ("When one party to a contract materially breaches the contract, the other party is— if it so chooses—discharged and freed of any obligation to perform and may at that point sue for damages.").

The problem with the dealers' position here is not materiality but the remedy they claim for the earlier warranty and rebate breaches. They claim the right to keep the new RVs without paying for them. That's ridiculous. The remedy they demand simply does not fit the terms of the breaches and would violate the most basic premise of contract remedies. It would put the dealers in a much better position than if Evergreen had honored all of its warranty and rebate promises. "One of the broad remedial goals of the Uniform Commercial Code is that the aggrieved party be put in as good a position as if the other party had fully performed, but not in a better position." *General Motors Corp. v. Sheets*, 818 N.E.2d 49, 54 (Ind. App. 2004); Ind. Code. § 26-1-1-106 ("The remedies … shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed…."). Accord, 11 Corbin on Contracts § 55.3 (2021) ("One who commits a breach of contract must make compensation to the injured party. In determining the amount of this compensation as the 'damages' to be awarded, the aim in view is to put the injured party in as good a position as that party would have been in if performance had been rendered as promised."); 24 Williston on Contracts § 64:1 (4th ed.) ("[T]he disappointed promisee is generally entitled to an award of money damages in an amount reasonably calculated to make him or her whole and neither more nor less; any

greater sum operates to punish the breaching promisor and results in an unwarranted windfall to the promisee, while any lesser sum rewards the promisor for his or her wrongful act in breaching the contract and fails to provide the promisee with the benefit of the bargain he or she made."). We see no plausible basis for allowing the dealers to keep new products without paying for them when the purchase prices far exceeded the amounts owed in the opposite direction.

## C. *Setoffs*

Both sides attack the district court's sensible handling of these issues, which was to allow the dealers to set off the amounts Evergreen owed them against the amounts they owed to Evergreen (and thus KR Enterprises) for the 21 disputed RVs. KR Enterprises argues there was no legal basis for any setoffs. The dealers argue that the setoffs were not large enough because they did not account for what the dealers say were diminished values of the new RVs due to the voided manufacturer warranties.

### 1. *Legal Basis for Setoffs*

As a preliminary matter, plaintiff KR Enterprises contends there is no legal basis for any setoffs in this case. KR Enterprises argues that the security interest in the 21 RVs was perfected under Indiana Code § 26-1-9.1-607 when Evergreen held them as inventory, and that § 26-1-9.1-402 then protects KR Enterprises from Evergreen's debts to the dealers. The dealers argue that Indiana Code § 26-1-9.1-404 applies, rendering KR Enterprises liable for the dealers' claims for unpaid rebates and warranties. We agree with the district court and the dealers: § 26-1-9.1-404 applies and § 26-1-9.1-402 does not.

Section 9-404 of the Uniform Commercial Code regarding the rights of an assignee provides in relevant part that

> the rights of an assignee are subject to: (1) all terms of the agreement … and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and (2) any other defense or claim of the account debtor against the assignor which accrues….

Ind. Code § 26-1-9.1-404(a). Accordingly, KR Enterprises took its "assignment subject to defenses and claims of an account debtor," i.e., the dealers here. U.C.C. § 9-404, cmt. 2. KR Enterprises' assignment is subject both to claims arising from the "transaction that gave rise to the contract" (the sales of the 21 RVs), and to "any other defense or claim of [the dealers] against [KR Enterprises] which accrues…" (such as past-due rebates and warranties). U.C.C. § 9-404.

Courts commonly apply setoffs to settle outstanding debts owed in both directions. See generally *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1993) (discussing history of setoff doctrine and concluding that setoffs outside of bankruptcy are subsets of permissive counterclaims; holding that since amounts claimed were exceeded by setoff debts, plaintiff subcontractors were entitled to nothing); *In re U.S. Aeroteam, Inc.*, 327 B.R. 852, 865 (S.D. Ohio 2005) ("Generally, courts are in agreement that an assignment of rights can create mutuality for setoff purposes."), citing *Schechter v. ACME Screw Co. (In re Assured Fastener Prods. Corp.)*, 773 F.2d 105, 107 (7th Cir. 1985) (bankruptcy proceeding; setoffs allowed against assigned receivables).

On this issue, this case is similar to *InfinaQuest, LLC*, where one party purchased the security interest in a defaulted loan. The court offset the amount owed to that party by the remaining amounts owed on accounts receivable because those accounts were part of the purchased security interest. *InfinaQuest, LLC v. DirectBuy, Inc.*, 18 F. Supp. 3d 959, 965 (N.D. Ind. 2014) ("InfinaQuest thus took its interest in the existing accounts subject to this pre-existing right of set off."). In this case, when KR Enterprises took assignment of 1st Source's interest in Evergreen's accounts receivable, the transfer was subject to the debts Evergreen owed on those accounts.

To avoid the setoffs, KR Enterprises claims that its security interest was perfected under Indiana Code § 26-1-9.1-607 when Evergreen held the 21 RVs as inventory. It relies on § 26-1-9.1-402 to protect it from liability for debts to the dealers. This argument misreads § 9.1-402, which protects a secured party only from *independent* liability for the debtor's tort or contract violations "merely because a security interest exists." Ind. Code § 26-1-9.1-402, cmt. 2; U.C.C. § 9-402, cmt. 2. It does not provide a blanket protection from counterclaims relating to the transaction or account at issue; § 26-1-9.1-404 ensures that such claims survive, as they are bound to the assignment.

If § 26-1-9.1-402 applied the way KR Enterprises argues it does, we would expect to see extensive caselaw indicating as much, leaving lots of unhappy dealers stuck with paying full price for new products while old debts owed by manufacturers to those dealers would have been wiped away. We have not found that body of case law. The best KR Enterprises can do to support its remarkable theory (heads we win, tails you lose) is a tangential quotation from a district court in Washington noting that the Ninth Circuit had previously refused

to apply § 9-404 to suits for "repossession or conversion since the basis for a conversion suit is the secured party's superior interest in the inventory itself, not the assignment of the account held by the debtor." See *DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency, Inc.*, No. C14-5880-JLR, 2015 WL 3797162, at *5 (W.D. Wash. June 17, 2015), quoting *United States v. Handy & Harman*, 750 F.2d 777, 786 (9th Cir. 1984) (discussing predecessor to U.C.C. § 9-404). The observation is not relevant here because this case involves neither a repossession nor a conversion. KR Enterprises wants cash. Its claims fall squarely under § 26-1-9.1-404.

We conclude that Indiana Code § 26-1-9.1-404 applies: the amounts the dealers owe KR Enterprises for the unpaid 21 RVs should be offset by the amounts Evergreen still owed the dealers for rebates and warranties, exactly as the district court decided.

### 2. *No Setoffs for Diminished Value*

The district court found "no legal theory for [the dealers'] claimed entitlement to setoff for diminished value of the RVs due to Evergreen's going out of business and the loss of a manufacturer's warranty." This is the second legal point on which we disagree with the district court, but it also does not change the bottom line here. There is a legal basis for setoffs for diminished value, but the dealers failed to establish a factual basis for the larger setoffs they seek here.

We have acknowledged that "impairment of the marketability of an asset reduces its value, since sale value is a dimension of value even when hypothetical." *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 820 (7th Cir. 1994) (concluding that jury should have been asked to estimate how

much sale value was diminished by lack of insurance and emphasizing that any such diminished value should be considered in context of probabilistic loss). But *Transcraft* involved the sale of a company and its diminished value due to lack of insurance. This case involves the sale of 21 RVs with agreed-upon invoice prices. The dealers argue that the values were diminished after the sales when Evergreen closed up shop and was no longer in a position to honor its warranties. There is an important distinction between the sale of a business, the price of which is quite variable, and the sale of an item like an RV for which there is an invoice defining a clear and negotiated price. *Transcraft* does not mandate setoffs for diminished value, but there is a legal basis for such setoffs. The district court erred in concluding the opposite.

The district court went on to conclude correctly, though, that even if the dealers' claims for setoffs for diminished value had a legal basis, their proof was inadequate. The dealers argue that the court improperly "imposed an expert evidentiary standard for diminished value setoffs." The argument misunderstands the district court's decision.

The district court did not require expert evidence. It only noted, fairly, that the dealers "did not present expert testimony on the subject, but merely relied on the testimony of its General Counsel … who offered nothing more than vague testimony about discounted prices on Evergreen's RVs post-closure." While the district court addressed in its opinion only two of the four lay witnesses put forward by the dealers, it considered the evidence presented and simply viewed it as unpersuasive.[5] We cannot disagree with the district court's

---

[5] The dealers' evidence came from four lay witnesses: (1) the general counsel for the dealers testified vaguely about discounted prices on the

conclusion: "These cobbled-together bits of indefinite anecdotal testimony are an insufficient basis to reasonably determine an appropriate setoff for diminished value."[6]

KR Enterprises disputed the district court's ruling as to granting setoffs at all but did not dispute the district court's calculation of the amounts. We affirm both the district court's refusal to calculate or incorporate setoffs for diminished value

---

RVs and that after June 8, 2016, some new RVs were liquidated at a discounted rate of up to 50%; (2) a 1st Source witness testified that during Evergreen's liquidation, it sold "some" of its RV inventory at 20% to 30% off of the manufacturer's retail price; (3) an Evergreen executive testified that in June 2016, Evergreen was liquidating new RVs at 30% to 35% off the standard invoice pricing and that some of the discounts Evergreen offered reached 50%; and (4) an Evergreen executive testified that prior to June 10, 2016, he began liquidating RVs by discounting the standard invoice pricing, starting at 15% to 20% off of invoices.

[6] In addition, later events that might affect the resale value of the 21 RVs should not be relevant to their value on the date of delivery. See U.C.C. § 2-607(1) ("The buyer must pay at the contract rate for any goods accepted."); U.C.C. § 2-607(5) & cmt. 5 (addressing breach of warranty); see generally *Quaker Alloy Casting Co. v. Gulfco Industries, Inc.*, 686 F. Supp. 1319, 1344 (N.D. Ill. 1988) (seller entitled to unpaid purchase price of parts accepted by buyer, even though buyer's breach of warranty claim had not been resolved and buyer claimed right to setoff); *Stimpson Hosiery Mills, Inc. v. Pam Trading Corp.*, 392 S.E.2d 128, 135 (N.C. App. 1990) (buyer must pay contract price to seller after accepting defective goods, but may sue for breach of warranty); *Fred J. Miller, Inc. v. Raymond Metal Prods. Co.*, 290 A.2d 527, 529–30 (Md. 1972) (acceptance or rejection of pipe was relevant only to liability for its purchase price and was of no consequence to buyer's right to maintain action against seller for breach of pipe's warranty). And in the case of a breach of manufacturer's warranty, given that there is a secondary market for warranties and repairs, the diminution in value caused by such a breach should be measurable and provable with evidence. The dealers did not offer such evidence here.

and its ultimate calculations of the rebate and warranty set-offs.

Finally, because we affirm the setoffs for Evergreen's breaches on the rebate and warranty claims, we also affirm the district court's denial of prejudgment interest. KR Enterprises made clear in its briefs and oral argument that it could prevail on the prejudgment interest only if we reversed on the setoffs.

For these reasons, the judgment of the district court is AFFIRMED.